UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

CASE NO.: 24-13159
District Court Docket No.: 19-cv-24766-KMW

_____

CARNIVAL CORPORATION,

Appellant,

vs.

JANE DOE,

Appellee.

_____

APPEAL TAKEN FROM
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

_____

**ANSWER BRIEF**

_____

Daniel W. Courtney, P.A.
*Counsel for Appellee*
10800 Biscayne Blvd., Suite 700
Miami, FL 33161
Tel. No. 305-579-0008
Fax No. 305-563-7055
dc@danielcourtneylaw.com

By:   */s/ Daniel W. Courtney*
        Daniel W. Courtney
        Florida Bar No. 499781

Philip D. Parrish, P.A.
*Counsel for Appellee*
7301 SW 57th Court, Suite 430
Miami, FL  33143
Tel. No.: 305-670-5550
Fax No.: 305-670-5552
phil@parrishappeals.com

By:   */s/ Philip D. Parrish*
        Philip D. Parrish
        Florida Bar No. 541877

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

Pursuant to Fed.R.App.P. 26.1 and 11th Cir. Rule 26.1-1, Appellee notifies the Court that the following persons and entities have an interest in the outcome of this appeal:

Anggara, Fredy

Cabeza, Lauren Nicole

Carnival Corporation

Courtney, Daniel Warren

Daniel W. Courtney, P.A.

Hogan Lovells US LLP

Lempinen, Sierra

Levitt, Lauren Ashley

Louvis, Ezra P.

Mase Seitz Briggs, P.A.

Mase, Curtis Jay

Philip D. Parrish P.A.

Parrish, Philip Dixon

Rauh, Tyler Joseph

Robinson, Charlotte Ashley

Seitz, William Robert

Stetson, Catherine E.

Torres, Edwin G. (United States Chief Magistrate Judge)

Williams, Kathleen M. (United States District Judge)

/s/ Philip D. Parrish
Philip D. Parrish
FBN: 541877

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff/Appellee, Jane Doe, agrees with the Appellant, Carnival Corporation, that the Court would benefit from hearing oral argument by the parties.

## CERTIFICATE OF TYPE SIZE AND FONT

Undersigned counsel certifies that the size and style of type used in this brief is 14-point Times New Roman.

## <u>TABLE OF CONTENTS</u>

Contents

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

CERTIFICATE OF TYPE SIZE AND FONT ........................................................ i

TABLE OF CONTENTS............................................................................... ii

TABLE OF AUTHORITIES ..........................................................................v

INTRODUCTION.........................................................................................1

STATEMENT OF JURISDICTION...................................................................2

ISSUES PRESENTED: ...................................................................................2

    1.    Whether the trial court properly granted Plaintiff's Motion for Partial Summary Judgment on false imprisonment and did not abuse its discretion by denying Carnival's initial motion for reconsideration because Anggara's statements are hearsay, and the FBI Reports' conclusions were untrustworthy, and unfairly prejudicial under Rule 403. .................................................................2

    2.    Whether the district court abused its discretion when it denied Carnival's "Renewed" Motion to Reconsider because Carnival stipulated to the admission of the evidence, and moved it into evidence on the first day of trial, yet waited until near the conclusion of trial to seek reconsideration. ...........................................2

    3.    Whether the district court abused its discretion by refusing to permit Carnival to use Fed.R.Evid. 705 to Admit Unfairly Prejudicial Opinions Plaintiff's Experts Never Saw Let Alone Relied Upon.............................................................................3

    4.    Whether Carnival failed to: (A) establish that maritime law acknowledges a mitigation of non-economic damages defense;

(B) carry its burden to prove mitigation of damages; and (C) present an instruction on mitigation of psychological care damages. ...................................................................................3

5.  Whether the district court properly calculated and awarded prejudgment interest. ............................................................3

6.  Whether the district court abused its discretion by denying Carnival's Motion for Remittitur, where there was uncontroverted evidence of Plaintiff's damages, and Carnival failed to address damages in closing argument. .....................3

STATEMENT OF THE CASE AND FACTS ..........................................3

STANDARD OF REVIEW .....................................................................29

SUMMARY OF THE ARGUMENT ......................................................30

ARGUMENT ..........................................................................................32

I.  THE TRIAL COURT PROPERLY GRANTED PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FALSE IMPRISONMENT AND DID NOT ABUSE ITS DISCRETION BY DENYING CARNIVAL'S INITIAL MOTION FOR RECONSIDERATION BECAUSE ANGGARA'S STATEMENTS ARE HEARSAY, AND THE FBI REPORTS' CONCLUSIONS WERE UNTRUSTWORTHY, AND UNFAIRLY PREJUDICIAL UNDER RULE 403 ...............................................................32

II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED CARNIVAL'S "RENEWED" MOTION TO RECONSIDER BECAUSE CARNIVAL STIPULATED TO THE ADMISSION OF THE EVIDENCE, AND MOVED IT INTO EVIDENCE ON THE FIRST DAY OF TRIAL, YET WAITED UNTIL NEAR THE CONCLUSION OF TRIAL TO SEEK RECONSIDERATION ..........................................39

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY REFUSING TO PERMIT CARNIVAL TO USE FED.R.EVID. 705 TO ADMIT UNFAIRLY PREJUDICIAL OPINIONS PLAINTIFF'S EXPERTS NEVER SAW LET

ALONE RELIED UPON ....................................................................45

IV.   CARNIVAL FAILED TO: (A) ESTABLISH THAT
      MARITIME LAW ACKNOWLEDGES A MITIGATION OF
      NON-ECONOMIC DAMAGES DEFENSE; (B) CARRY ITS
      BURDEN TO PROVE MITIGATION OF DAMAGES; AND
      (C) PRESENT AN INSTRUCTION ON MITIGATION OF
      PSYCHOLOGICAL CARE DAMAGES ...........................................47

V.    THE DISTRICT COURT PROPERLY CALCULATED AND
      AWARDED PREJUDGMENT INTEREST .......................................51

VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
      BY DENYING CARNIVAL'S MOTION FOR REMITTITUR,
      WHERE THERE WAS UNCONTROVERTED EVIDENCE OF
      PLAINTIFF'S DAMAGES,  AND CARNIVAL FAILED TO
      ADDRESS DAMAGES IN CLOSING ARGUMENT ......................53

CONCLUSION ...................................................................................55

CERTIFICATE OF COMPLIANCE ......................................................56

CERTIFICATE OF SERVICE ..............................................................56

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Aaron Private Clinic Mgmt., LLC v. Berry*,
   912 F.3d 1330 (11th Cir. 2019) ..........................................................32

*Access Now, Inc. v. Sw. Airlines Co.*,
   385 F.3d 1324 (11th Cir. 2004) ..........................................................40

*Ackermann v. United States*,
   340 U.S. 193 (1950) ...........................................................................31

*Aldana v. Del Monte Fresh Produce N.A., Inc.*,
   741 F.3d 1349 (11th Cir. 2014) ..........................................................31

*Argonaut Ins. Co. v. May Plumbing Co.*,
   474 So.2d 212 (Fla. 1985) ..................................................................53

*Barfield v. Orange County*,
   911 F.2d 644 (11th Cir. 1990) ...................................................... 34, 35

*Barrera v. E.I. Du Pont de Nemours & Co.*,
   653 F.2d 915 (5th Cir. 1981) ..............................................................47

*Bearint ex rel. v. Dorell Juvenile Group Inc.*,
   389 F.3d 1339 (11th Cir. 2004) .................................................... 30, 48

*Beech Aircraft Corp. v. Rainey*,
   488 U.S. 153 (1988) .................................................................... 33, 34

*Bobb v. Modern Products, Inc.*,
   648 F.2d 1051 (5th Cir. June 26, 1981)...............................................46

*Bonner v. City of Prichard, Ala.*,
   661 F. 2d 1206 (11th Cir. 1981) .........................................................46

*Boudreau v. S/V Shere Khan C*,
   27 F.Supp.2d 72 (D. Me. 1998)..........................................................48

*Bryan v. John Bean Division of FMC Corp.*,
   566 F.2d 541 (5th Cir. 1978) ..............................................................46

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
    47 F.4th 1278 (11th Cir. 2022) ................................................................37

*Carter v. DecisionOne Corp.*,
    122 F.3d 997 (11th Cir. 1997) ................................................................48

*Chuy v. Philadelphia Eagles Football Club*,
    595 F.2d 1265 (3d Cir. 1979) ................................................................49

*City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*,
    515 U.S. 189 (1995) ................................................................51

*Conjugal Partnership v. Conjugal Partnership*,
    22 F.3d 391 (1st Cir. 1994) ................................................................48

*Crawford v. ITW Food Equip. Grp., LLC*,
    977 F.3d 1331 (11th Cir. 2020) ................................................................35

*Doe v. Celebrity Cruises Inc.*,
    287 F.Supp.2d 1321 (S.D. Fla. 2003) ................................................................54

*Doe v. Celebrity Cruises, Inc.*,
    394 F.3d 891 (11th Cir. 2004) ........................................................ 30, 54

*Doe v. School Board of Miami-Dade County Florida*,
    2022 WL 3973881 (S.D. Fla. 2022) ................................................................55

*Dolsak v. Comm'r of Soc. Sec.*,
    724 F.App'x 914 (11th Cir. 2018) ................................................................48

*E.S.I. Meats Inc. v. Gulf Fla. Terminal Co.*,
    639 F.2d 1348 (5th Cir. 1981) ........................................................ 52, 53

*Fashauer v. New Jersey Transit R. Operations, Inc.*,
    57 F.3d 1269 (3d Cir. 1995) ................................................................48

*Ferrill v. Parker Group Inc.*,
    168 F.3d 468 (11th Cir. 1999) ........................................................ 31, 54

*Fidelity Interior Construction Inc. v. Southeastern Carpenters Regional Council*,
    675 F.3d 1250 (11th Cir. 2012) ........................................................ 29, 47

*Frederick v. Kirby Tankships, Inc.,*
  205 F.3d 1277 (11th Cir. 2000) ...................................................... 48, 50

*Gilliam v. Allen*,
  62 F.4th 829 (4th Cir. 2023) ...............................................................53

*Good Luck Nursing Home Inc. v. Harris*,
  636 F.2d 572 (D.D.C. 1980) ................................................................44

*Goodman v. Kimbrough*,
  718 F.3d 1325 (11th Cir. 2013) ..........................................................36

*Griffin v. City of Opa-Locka*,
  261 F.3d 1295 (11th Cir. 2001) ..........................................................54

*Havis v. Petroleum Helicopters Inc.*,
  664 F.2d 54 (5th Cir. December 14, 1981) .........................................53

*Hines v. Brandon Steel Decks*,
  886 F.2d 299 (11th Cir. 1989) ............................................................35

*Hornady v. Outokumpu Stainless USA, LLC*,
  118 F.4th 1367 (11th Cir. 2024) ................................................... 43, 44

*In re Louisiana Crawfish Producers*,
  852 F.3d 456 (5th Cir. 2017) ..............................................................44

*Jensen v. EXC, Inc.*,
  82 F.4th 835 (9th Cir. 2023) ...............................................................46

*Kernel Records Oy v. Mosley*,
  694 F.3d 1294 (11th Cir. 2012) ..........................................................32

*Kerrivan v. R.J. Reynolds Tobacco Co.*,
  953 F.3d 1196 (11th Cir. 2020) ..........................................................54

*Lebron v. Royal Caribbean Cruises Ltd.*,
  2021 WL 2917265 (11th Cir. 2021) ....................................................52

*Miller v. Field*,
  35 F.3d 1088 (6th Cir. 1994) ........................................................ 36, 44

*Nevor v. Moneypenney Holdings, LLC,*
  842 F.3d 113 (1st Cir. 2016) ........................................................ 49, 51

*NLRB v. Pilot Freight Carriers Inc.,*
  604 F.2d 375 (5th Cir. 1979) .................................................................48

*Odom v. R.J. Reynolds Tobacco Company,*
  254 So.3d 268 (Fla. 2018) ....................................................................54

*Ornstein v. New York Health & Hospitals Corp.,*
  881 N.E.2d 1187 (N.Y. 2008) ...............................................................49

*Packer v. Jones,*
  2010 WL 7367820 (S.D. Ala. 2010) .....................................................38

*Proctor v. Fluor Enters.,*
  494 F.3d 1337 (11th Cir. 2007) ...................................................... 30, 40

*Reichert v. Chemicals Carriers, Inc.,*
  794 F.2d 1557 (11th Cir. 1986) ...................................................... 31, 52

*Robinson v. Pocahantas Inc.,*
  477 F.2d 1048 (1st Cir. 1973) ...............................................................53

*Robinson v. United States,*
  2022 WL 19001971 (N.D. Ga. 2022) ....................................................37

*Rubenstein v. Yehuda,*
  38 F.4th 982 (11th Cir. 2022) ...............................................................49

*Ruiz v. Wing,*
  991 F.3d 1130 (11th Cir. 2021) .............................................................40

*Sayer v. Musicland Group, Inc.,*
  850 F.2d 350 (8th Cir. 1988) ................................................................48

S*tate ex rel. Dresskell v. City of Miami,*
  13 So.2d 707 (Fla. 1943) .......................................................................48

*Sunderland Marine Mut. Ins. Co. v. Weeks Marine Const. Co.,*
  338 F.3d 1276 (11th Cir. 2003) .............................................................51

*Tesoriero v. Carnival Corp.*,
   965 F.3d 1170 (11th Cir. 2020) ……………………………………………………14

*Tessmer v. Walker*,
   833 F.2d 925 (11th Cir. 1987) ...................................................................44

*Tippens v. Celotex Corp.*,
   805 F.2d 949 (11th Cir. 1986) ...................................................................38

*United States ex rel. Barrick v. Parker-Migliorini Int'l*,
   79 F.4th 1262 (10th Cir. 2023) ..................................................................35

*United States v. A & S Council Oil Co.*,
   947 F.2d 1128 (4th Cir. 1991) ...................................................................47

*United States v. Gluk*,
   831 F.3d 608 (5th Cir. 2016) .....................................................................41

*United States v. Smith*,
   606 F.3d 1270 (10th Cir. 2010) .................................................................37

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ........................................................ 15, 36

Rules

11th Cir. Rule 26.1-1...................................................................................1

Fed.R.App.P. 26.1 ......................................................................................1

Fed.R.App.P. 32(a)(7)(B) ...........................................................................56

Fed.R.Civ.P. 26 ................................................................................... 45, 50

Fed.R.Civ.P. 54(b) ........................................................................ 31, 43, 44

Fed.R.Civ.P. 59(e)......................................................................................18

Fed.R.Civ.P. 60(b) ....................................................................................44

Fed.R.Civ.P. 60(b)(6) ................................................................................31

Fed.R.Evid. 403    ………………………………………………………passim

Fed.R.Evid. 703 …………………………………………………………47

Fed.R.Evid. 705 ........................................................................ passim

Fed.R.Evid. 803(2)................................................................................37

Fed.R.Evid. 803(8)(c) ...................................................................... 16, 34

## **INTRODUCTION**

On the last night of her Carnival cruise, Plaintiff, a 21-year-old highly intoxicated female passenger was running, stumbling, and crawling all around open public decks of the Carnival *Miracle*.   She slipped and fell, hit her head, and minutes later was raped by a Carnival crew member in a maintenance closet, not remembering how she even got there.   Carnival headquarters was aware of the rape within two hours, and conducted its own investigation before the FBI boarded later that morning. Despite numerous CCTV cameras in the area, Carnival would deny that it had any CCTV video of the Plaintiff running around the open decks.   But Carnival janitor Fredy Anggara was watching.

The opening lines of Carnival's Brief reference the delicacy and care which must be used in sexual assault cases.   But Carnival treated this case and Ms. Doe with anything but delicacy and care.   First, Carnival hid evidence from the FBI. Then it hid evidence from the Plaintiff and the district court, for which it was sanctioned.

Carnival's lack of fidelity to the record continues on appeal.   Carnival accuses Plaintiff of making an "about-face" following the district court's grant of summary judgment on her false imprisonment claim.   But Carnival and Plaintiff **together stipulated** to introduce the handwritten FBI notes (not the two typed FBI Reports) even before Carnival first moved for reconsideration on the partial summary

judgment, yet failed to raise the stipulation as a basis for reconsideration.

Nor did *Plaintiff* introduce the joint exhibit; **Carnival** did as trial commenced:

**Carnival's counsel**:   So for the record, Judge, all of the joint exhibits,
I hereby move into evidence.

**The Court**: Alright. All of the joint exhibits previously provided to the
Court are hereby admitted into evidence.

(Doc. 317, p. 3-4).

Carnival eagerly admitted the FBI notes and touted them in its opening statement, yet failed to raise the freshly admitted evidence as a basis to revisit the partial summary judgment until the end of trial.   The district court properly denied that tardy motion due to the prejudice Carnival's tactical decision caused to the presentation of Plaintiff's case.

## STATEMENT OF JURISDICTION

Plaintiff/Appellee accepts Defendant/Appellant's Statement of Jurisdiction.

## ISSUES PRESENTED:

1.     Whether the trial court properly granted Plaintiff's Motion for Partial Summary Judgment on false imprisonment and did not abuse its discretion by denying Carnival's initial motion for reconsideration because Anggara's statements are hearsay, and the FBI Reports' conclusions were untrustworthy, and unfairly prejudicial under   Rule 403.

2.     Whether the district court abused its discretion when it denied Carnival's "Renewed" Motion to Reconsider because Carnival stipulated to the admission of the evidence, and moved it into evidence on the first day of trial, yet waited until near the conclusion of trial to seek reconsideration.

3.   Whether the district court abused its discretion by refusing to permit Carnival to use Fed.R.Evid. 705 to Admit Unfairly Prejudicial Opinions Plaintiff's Experts Never Saw Let Alone Relied Upon.

4.   Whether Carnival failed to: (A) establish that maritime law acknowledges a mitigation of non-economic damages defense; (B) carry its burden to prove mitigation of damages; and (C) present an instruction on mitigation of psychological care damages.

5.   Whether the district court properly calculated and awarded prejudgment interest.

6.   Whether the district court abused its discretion by denying Carnival's Motion for Remittitur, where there was uncontroverted evidence of Plaintiff's damages, and Carnival failed to address damages in closing argument.

## STATEMENT OF THE CASE AND FACTS

### A Carnival Crew Member Sexually
### Assaults a Drunken and Likely Concussed Passenger

In December 2018 Plaintiff was a 21-year-old female on her first cruise. (Doc. 319, p. 156; 160).   She enjoyed excursions in the Cayman Islands, on Roatan Island and in Belize.   (Doc. 319, p. 162-165).   On the final day of the cruise, she and her cabinmate Amanda Powell decided to celebrate.

Plaintiff had her first drink, a glass of Rosé around noon.   (*Id.*, p. 173).   She brought a bottle of Crown Royal and Amanda brought a bottle of vodka on the cruise. (*Id.*, p. 174).   They were drinking their own liquor throughout the day.   (*Id.*)   In

addition, Amanda's parents purchased the unlimited drink package and may have provided them drinks.  (*Id.*)

At about 4:30 in the afternoon they went back to their cabin to get ready for dinner.  They opened a bottle of Champagne, and the Plaintiff had three glasses. (*Id.*, p. 176-177).  At 6:06 p.m. her Sign and Sail card reflects that she bought a glass of white sangria.  (*Id.*, p. 177).  At this point she was "already buzzed."

This was the first night they sat at their assigned table, and discovered they were paired with two young men, James and John, for dinner.  Carnival records show that Plaintiff ordered a glass of Moscato at 6:41, and a pomegranate martini at 7:31 p.m.  (Doc. 319, p. 178).  When she left dinner at 7:45 or 8:00 she was "pretty drunk."  At 8:13 p.m., 10:04 p.m. and 11:23 p.m., they ordered Sprite and club soda to mix with their whiskey and vodka.  (*Id.*, p. 180).

Things got blurry for the Plaintiff.  Her memory of the evening faded in and out. (*Id.* p. 184).  The four went to a comedy show, and Plaintiff remembers little after that.  (Doc. 93-4, p. 5 of 11).  She was "pretty blackout drunk," with only snippets of recall for the evening.  She remembered being in an elevator with Amanda and James and then playfully running out of it leaving them to find her. (Doc. 319, p. 184).  Her next memory was sitting next to a woman on a lawn chair who was playing a video game.  (*Id.*, p. 184).  She then remembers Amanda calling her name, beginning to run and then slipping on Deck 9, falling and hitting her head.

4

(*Id.*, p. 184). Her next memory is seeing a staircase and crawling up the stairs to Deck 10, unsure why. (*Id.*, p. 185). After that she recalls peering through a glass down at Amanda on Deck 9. (*Id.*, p. 185). Her next memory was in the closet with Carnival crew member Fredy Anggara. (*Id.*, p. 185).

When asked at trial what she remembered about being in the closet she could not speak. The Court took a recess to allow her to compose herself. (Doc. 319, p. 185-186; 90 of 237). Even after the break, she was nervous and uncomfortable. Despite having been on the stand for an hour, she suddenly felt smothered by her Covid mask, and asked to remove it. (*Id.*, p. 186).

She remembered "looking up, seeing his hand holding onto a lock, and he was just staring down at me." (*Id.*). She was "scared seeing him holding the lock. . . ." (*Id.*, p. 186). She also remembered him "ejaculating while I was bent over, and I had my – I was looking back at him." (*Id.*, p. 187). She had no memory of how she got out of the closet. (*Id.*) Here are two pictures of the closet:





Exhibits 312-40, Photo 8 with a closed door and Photo 9 with open door.

Even after she was out of the closet, Anggara was not done. The next thing she knew, he was "on top of me." "He put his arms over my – over my back. He had his face in my – in my neck and told me that he wanted to come back to my cabin, that he was going on a break." (Doc. 319, p. 187). She felt scared and told him no. (*Id.*, p. 188). She pulled away from him and found her way back to her cabin. (*Id.*).

When she returned to the cabin she began crying and told Amanda what happened. (Doc. 93-5, p. 3 of 4). She told Amanda "He locked me in a closet. He locked me in there." (Doc 312-26, p. 6 of 10). "He told her if she bent over he

would open the door." (*Id.*)  Plaintiff was concerned about reporting the rape because she had been sexually abused by her grandfather as a child, and was traumatized when she told her mother and her mother disbelieved her.  (Doc. 319, 50).  But Amanda told her to consider what if it had been Amanda's 11-year-old sister, so Plaintiff decided that "we had to go down and tell somebody."  (Doc. 319, p. 190).

They first went to Guest Services.  (Doc. 319, p. 191).  Carnival's Security Officer's Watch Report described Plaintiff at the Guest Services Desk "lying on the floor breathing heavily," so they assisted her to a nearby couch where she was still speaking in a heavy breath, while at other times could not talk and was advised to "relax and take her time."  (Doc. 312-42, p. 3 of 3). Carnival's Corporate Representative testified that at 3:05 a.m., an hour and a half after the incident, "she was highly intoxicated, so I think they put her in a wheelchair, and they wheeled her down to the medical center."  (Doc. 93-1, p. 4 of 8; Doc 318, p. 14).   The next thing she recalls is a female security officer hovering over her and trying to pick her up from the floor.  (*Id.*)   Next, she remembers being in the medical center, two hours after the assault where she arrived, as Carnival's doctor put it, "in emotional distress, under the influence of alcohol."  (Doc. 312-2, p. 7).

She remembers crying and freaking out until a doctor pushed down on her chest to calm her.  (Doc. 319, p. 192).   After telling Dr. Molina what happened Dr.

Molina apologized and said unfortunately it happens all the time, then grabbed a bunch of papers and told Plaintiff they would do a rape kit. (*Id.*). She had to undress for the rape kit which made her feel exposed as Dr. Molina examined her. (*Id.,* p. 193). She told the doctor that she slipped and hit her head. (*Id.*)

After several hours in the clinic, a female security officer escorted them back to their cabin, where a male security officer was waiting. (*Id.*, p. 196). Carnival acknowledged that security "held off on that interview for a few hours because they – [Plaintiff] at that time, she needed to sober up and calm down." (Doc. 114-2, p. 2).[1] They recorded statements from Plaintiff, Amanda, and separately Anggara. The security guards hovered over her while she wrote her written statement. (Docs. 319, p. 197; 412-13, p. 2). The use of those body worn cameras (BWC) was noted by Carnival on its investigation report later sent to the FBI, but not disclosed to the investigating officers. (Docs. 93-3, p. 5; 111-2; 111-4).

Later two FBI agents boarded the vessel and interviewed Plaintiff, Amanda, and Anggara. Special Agent Sara Andreasen made the "handwritten notes" Carnival stipulated and moved into evidence. (Doc. 312-26). Several weeks later, two typewritten reports were completed (Docs. 111-2 and 111-4). These are referred to as the FBI "Reports," as opposed to the FBI notes.[2]

---

[1] Attached to the Appendix to this Brief is a picture of Plaintiff in her cabin later that morning with Security.

[2] Plaintiff urges this Court to review the handwritten notes (Doc. 312-26) and the typewritten

Doc. 111-4 is a one paragraph Report with the legal conclusion that "the investigation revealed the sexual encounter was consensual at the time of the event, and declination of prosecution was received from" an A.U.S.A. (Doc. 111-4, p. 1). Doc. 111-2 is a 4-page document containing a synopsis of the FBI Agent's interviews, including Plaintiff's statement that she "drank heavily throughout the evening," and "became so intoxicated she did not remember portions of the evening." (Doc. 111, p. 2). "She could not remember if she gave consent to have sexual intercourse." (Doc. 111-2, p. 2). Nevertheless, FBI Agent Andreasen "concluded" that the encounter was "consensual". (Doc. 111-2, p. 4).

## Carnival's Discovery Abuses

Doe commenced her action against Carnival in November, 2019. (Doc. 1). In her Complaint, Plaintiff alleged that she "gave a statement **while being video recorded** by Carnival." (Doc. 1, p. 5, para. 27). In discovery, Carnival produced only a 4-page written statement, but failed to mention or produce either the BWC video statements or any CCTV video. Plaintiff served Carnival with initial discovery requests including any CCTV video. (Doc. 53, p. 3). Carnival responded that "it was gathering information needed to respond it would supplement," notwithstanding that Carnival's counsel had informed Plaintiff's counsel that

---

Reports (Docs. 111-2 and 111-4) first to familiarize the Court with the distinctions between the documents.

Carnival viewed CCTV video of people entering and leaving the closet and of Doe hiding from her friend.   (*Id.*)    Frustrated by Carnival's delays and lies, Plaintiff set a discovery hearing before Magistrate Judge Torres on July 16, 2020.   (Doc. 59).

After six months of denial Carnival revealed *the day before the hearing that it had Plaintiff's video statement.*   (Doc. 59, p. 3).   Carnival's counsel claimed that she had received the videocam recordings "last week."   (*Id.*, p. 11).   The court was incredulous "And so it took Carnival basically six months to finally tell you they had a video?"   (*Id.*, p. 11).   He ordered the video produced.   (*Id.*, p. 19).

Carnival then misrepresented to the court that it had **only** the written statement from Anggara, for which it claimed the work product privilege.   (*Id.* p. 27).   Other routine discovery had also been concealed.   (*Id.*, p. 26). The court was incredulous, asking "You haven't given him contact information of the assailant yet," and noting that Anggara was "the one person with relevant knowledge is the guy who allegedly assaulted this lady."   (*Id.* at 28).   Carnival claimed it did not have Anggara's personnel file and when the court asked why, responded "I do not have a good answer for you on that.   It just doesn't exist.   Can't seem to be located."   (*Id.,* p. 29).

The court ordered Anggara's personnel file produced.   (*Id.*, p. 40; Doc. 50).   Carnival promised to produce it – or recreate it – within two weeks.[3]   (Doc. 59, p.

---

[3] Post trial Carnival was sanctioned for failing to disclose electronically stored information about Anggara disclosed for the first time at trial.   (Doc. 395, p. 17-18).

40). On September 16, 2020 Plaintiff moved for Sanctions, (Doc. 53), noting that Carnival recently revealed that it misled the court when it said that the only video it had was Doe's video statement. (Doc. 53, p. 7). Carnival still had not produced Fredy Anggara's personnel file. (*Id.*, p. 9).

A sanctions hearing occurred on September 25, 2020. (Doc. 66). Carnival's counsel had misrepresented when and how many videos it had received from Carnival. (Doc. 66, p. 3). Carnival's counsel learned of the videotapes the day after the July hearing, but said nothing until shortly before the sanctions hearing. (*Id.,* p. 29).

Plaintiff argued that Carnival's claimed ignorance of Mr. Anggara's videotaped statement was not credible. (*Id.*, p. 37).

> **The Court:** Let me ask you this question who told you, as you refer on page 84, who told you that there was no depiction of any video showing the Plaintiff at all? Who told you?

> **Carnival's Counsel:** I mean, Judge, when I say that I think – that's a good question. I mean, Judge, I don't know if it's a poor choice of words or what, but I can just tell you right now that from the outset there's been this – as I said, it's in the incident report that they looked at and what they saw. So I'm sorry, that's just a poor choice of words on my part. And again, it goes right back to my mistakenly saying in the beginning that there's nothing that captured her.

The court ruled that Carnival's discovery violations waived the work product privilege as to the videos. (*Id.*, pp. 68-69). He reserved ruling on sanctions. (*Id.*, p. 70).

12

Carnival's counsel also misrepresented that Carnival had complied with an Order to produce three years of prior substantially similar incidents.   He apologized for that misstatement in a written filing later that day.   (Doc. 62).   Then, forgetting that he had told the court at the July hearing he never told Plaintiff's counsel that Carnival had CCTV video depicting Plaintiff on the night of the incident, he admitted "I revealed to Plaintiff's counsel early in the case, prior to discovery commencing, that CCTV video reviewed onboard depicted Plaintiff running around the outside deck and falling on the evening of the subject incident."   (Doc. 62, p. 2, n. 1).   Post trial the district court sanctioned Carnival and its counsel for these and other discovery violations.   (Doc. 395).   *The FBI Reports were prepared without any knowledge of the CCTV video depicting the Plaintiff and Anggara, or their videotaped statements.*

After Plaintiff deposed the security officers and each either did not recall what he saw on CCTV or reviewed no CCTV, Plaintiff moved to strike Carnival's pleadings.   (Doc. 91).   Carnival's Corporate Representative surprisingly claimed in deposition that neither the Plaintiff, Amanda, or Anggara could be seen on CCTV.   (Doc. 91, p. 18). [4]   A few hours after that deposition Carnival amended its

---

[4] The statement was "surprising" due both to counsel's concession, and because the vessel had 160 functioning cameras, 25 of which covered decks 9 and 10. (Doc. 316, p. 12). At 1:30 a.m., traffic on the deck would have been light and so it would easy to detect Plaintiff and Anggara on CCTV. (Doc. 316, p. 29-30).   In fact, Anggara claimed Plaintiff kissed him in front of the camera.   (Doc. 312-26, p. 9).

interrogatory answers to have a Security Officer claim he was "confused" when he recalled two years earlier seeing Plaintiff running and falling on CCTV video.   (*Id.*, p. 18).[5]

> Post-trial the Magistrate Judge sanctioned Carnival:
>
> Accordingly, the Court finds that Section 1927 and Rule 37 sanctions are in order to compensate Doe and her counsel for fighting tooth and nail to obtain video that they were entitled to at a much earlier stage of the process. . . .   Those expenses will be born jointly and severally by Carnival and counsel.
>
> The Court could impose further sanctions for the multiple false representations provided to the Court as well.   But the entry of this Order finding that counsel engaged in reckless representations to the Court will suffice. . . .

(Doc. 395, p. 29-30).

### The Motion for Summary Judgment on Plaintiff's False Imprisonment Claim

Plaintiff moved for summary judgment on her claim of false imprisonment, supported by her written statement and deposition testimony.   (Doc. 92).   Carnival filed a perfunctory 4-page Response (Doc. 93; 93-4; 93-5; 192) relying on Mr. Anggara's statements, which it asserted "vividly recall the events *to the FBI*."   (Doc. 112, p. 1) (Emphasis added).   Carnival made no argument that *anything* in the FBI report was admissible as an exception to the hearsay rule.   (Doc. 112).   In her reply

---

[5] Carnival's evidence does have a tendency to go missing.  *See generally, Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1187-88 (11th Cir. 2020) (Rosenbaum J., dissenting).

Plaintiff argued that Anggara's statements in the FBI report were hearsay.  (Doc. 114, p. 2).  Carnival did not move for leave to file a sur-reply.

In its response to the Plaintiff's Statement of Material Facts (Doc. 111) Carnival referred to the FBI report's conclusion that the sexual encounter was consensual.  (Doc. 111).  But the sexual encounter was a separate issue from whether the Plaintiff had been, even for a few moments, in fear she could not leave the closet.  The FBI report made no comment on that issue.

Magistrate Judge Torres issued a 13-page Report and Recommendation (R&R) that acknowledged the parties agreement that "Doe does not remember how she entered or left the storage closet."  (Doc. 151, p. 5).  However, Doe's deposition testimony that Anggara locked the door and she feared for her safety recounted her firsthand knowledge of the incident.  "This evidence alone supports her false imprisonment claim."  (*Id.* at p. 5-6).

Meanwhile, Carnival relied on statements Anggara made to the FBI for the truth of the matter asserted which are "clearly hearsay under the Federal Rules of Evidence."  (Doc. 151, p. 7).  He correctly recognized that there were two levels of hearsay to be analyzed.   "The first is the FBI report itself."  (Doc. 151, p. 7).  Citing *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) he noted that it is "well established in our circuit that the FBI report is not admissible for anything other than the agent's own statements or observations, as opposed to third party

15

statements" like those made by Mr. Anggara.

"Carnival fails to make any persuasive argument how any relevant exception applies, which was clearly Carnival's burden in its response."  (Doc 151, p. 8-9).  The Order concluded:

> There is no evidence that the jury could rely on to reject Doe's undisputed recollection that at some point inside the closet Mr. Angarra did not let her exit the closet after she sought to do so.   For that period of time, Plaintiff's claim for false imprisonment has been established as a matter of law.

(Doc. 151, p. 10).   Carnival's Initial Brief presented no evidence to rebut that finding.   The FBI Reports drew no conclusions about false imprisonment.

Even before the summary judgment Order, Plaintiff moved in limine to preclude "the FBI's determination that the subject incident was consensual."   (Doc. 116, p. 2-3).   In response Carnival argued what it had failed to argue in its summary judgment response – that the report's conclusions were admissible under Fed.R.Evid. 803(8)(c).   (Doc. 128).   Plaintiff replied that the FBI Reports should be excluded under Rule 403:

> **Even if the Court believes that it is relevant and fits within a hearsay exception, the unfair prejudice to Plaintiff far outweighs any probative value** and the Court [sic, jury] should not hear that the FBI's determination that the encounter was consensual.   **It is clear that the FBI's determination is based on a criminal standard and we are proceeding on a civil standard**.

(Doc. 135, p. 1).   (Emphasis added).

The same day Carnival filed its Objections to the Magistrate Judge's Report

and Recommendation, the parties filed an agreed Exhibit List which included the handwritten "FBI notes from the day of the incident," (not the two finalized FBI Reports which Carnival had attached to its summary judgment response). (Doc. 154, p. 3).

The court addressed Joint Exhibit 26, the handwritten FBI notes, at the pretrial hearing on motions in limine:

> **The Court:**    As to Exhibit 26, it is my understanding from what parties have given me that those are notes from the day of the incident – the agent's handwritten notes – and the parties are still in agreement that all of that should come into evidence.  Is that still the parties' position?
>
> **Carnival' counsel**:    Yes, Your Honor.

(Doc. 315, Tab B, p. 5).

However, Carnival argued for admission of the FBI's legal conclusion of consensual sex and the declination of criminal prosecution.  The court explained that it would be improper, i.e., prejudicial to admit those legal conclusions because of the difference between the civil and criminal standard:

> . . . And even as to relevance, the conclusion of the FBI is of no moment in our case, nor is the decision of the A.U.S.A. on duty – their decision not to bring criminal charges – that has no relevance to our case.
>
> **Because of course their standard is proof beyond a reasonable doubt – not our standard here – and which we are not going to have a mini trial about in front of this jury.**

(*Id.*, p. 9).  (Emphasis added).  Thus, without specifically mentioning Rule 403, the

district court made a Rule 403 determination.

### Carnival Waived Any Argument that the Handwritten FBI Notes Could Be Considered in Opposition to Plaintiff's Motion for Partial Summary Judgment by Failing to Raise the Issue Until the End of Trial

Contrary to Carnival's assertion that "the evidentiary landscape unexpectedly shifted at trial," (I.B., p. 9) Carnival orchestrated that shift *long before trial*.

On June 25, 2021, Magistrate Judge Torres issued the R&R granting Plaintiff's Motion for Partial Summary Judgment. (Doc. 151). On July 2, 2021, Carnival filed Objections but did not argue its simultaneous stipulation to admit the handwritten FBI notes as a basis for reconsideration. (Docs. 153; 154). On May 31, 2022, the district court adopted the R&R. (Doc. 197). On June 13, 2022, the Final Joint Exhibit List was filed, stipulating to the admission of the handwritten FBI Notes. (Doc. 212 at 3).

That same day, Carnival moved for Reconsideration of the partial summary judgment under Rule 59(e). (Doc. 214). But, again, Carnival did not argue that the parties' stipulation formed a basis for reconsideration. On June 17, 2022, the parties agreed to a jury instruction on false imprisonment that Carnival was liable for false imprisonment. (Doc. 235 at 18). Four days later, the district court denied

Carnival's Motion for Reconsideration.   (Doc. 249).   Carnival never raised the stipulation as a basis for any pretrial relief.

During opening statements, Carnival told the jury: "You will have in evidence the notes from the FBI and the investigation they conducted."   (Doc. 388-6 at 128). Carnival did not move for reconsideration that day or at any point during the first week of trial.

At the end of the fourth trial day, the Court addressed jury instructions.   (Doc. 318 at 79).   Plaintiff submitted an instruction that the jury be told that the court had decided that Plaintiff was falsely imprisoned. Carnival agreed with Doe's requested change to the false imprisonment instruction, which essentially admitted liability for false imprisonment, without raising the stipulated evidence.

## The District Court Permitted a Full and Proper Cross Examination of Plaintiff's Expert Witnesses

The Plaintiff's expert security consultant, Lance Foster, testified in support of Plaintiff's direct claim against Carnival for negligent hiring, retention, and supervision.   (Doc. 317, p. 98).   Foster offered three opinions: (1) that Carnival did not have appropriate hiring practices to ensure reasonable protection of passengers from sexual assault; (2) that Carnival did not reasonably supervise its crewmembers; and (3) that the Plaintiff's sexual assault was reasonably foreseeable and preventable by Carnival.   (*Id.*, p. 100).

Although he responded affirmatively to a general question whether he based his opinions on the documents he had reviewed, the opinions were not based upon the FBI Reports, nor did they address the parties' statements. He admitted that his opinions were predicated on an *assumption* that Plaintiff was sexually assaulted. (Doc. 317, p. 137).

Foster's preventability opinion was based upon lack of sufficient security guards and failure to monitor the numerous CCTV cameras. (*Id.*, p. 133). His foreseeability opinion focused on the cruise industry and Carnival's experience with sexual assaults by passengers and crew members. (*Id.*, p. 132-133). His testimony did not refer to or rely upon the FBI Reports.

On cross examination Carnival quickly went to the documents that Foster had reviewed. (*Id.*, p. 135). He testified that "some material just isn't really useful to me and some more so." (*Id.*, p. 136). Carnival then questioned Mr. Foster on the handwritten FBI notes to establish that he had read *those* notes.[6] (*Id.*, p. 148).

However, the district court declined to permit Carnival to improperly impeach Mr. Foster with the substantively inadmissible opinions in the FBI Reports:

---

[6] The handwritten FBI notes, as opposed to the two final FBI Reports, did not contain the putative impeachment material.

**The Court:**    Mr. Seitz, whether or not a crime occurred, I don't think I could have been any clearer that we weren't going there; and yet we seem to keep stepping up to the edge of that precipice. Don't make me push you over it, Mr. Seitz.

(Doc. 317, p. 149).    Plaintiff observed that Carnival was purposely mistrying the case, and the Court concurred: "That thought actually occurred to me as well."    (*Id.*, p. 150).    The court was "utterly, utterly dismayed about the conduct of the defense . . . ."    (*Id.*, p. 153).    The district court exposed Carnival's contrived Rule 705 impeachment gambit, noting that Carnival had "deliberately set up a strawman to knock down by cross examining that the expert has reviewed FBI Reports and, therefore, you should be able to get into the fact that they determined it was consensual. . . ." (*Id.*, p. 154).

Plaintiff's counsel clarified that Carnival mistakenly said Mr. Foster had relied on the FBI *Reports*.    (*Id.*, p. 155).    Carnival agreed that Mr. Foster had reviewed unidentified "FBI records."    (*Id.*)[7]

### Testimony Regarding Plaintiff's Damages

Carnival failed to provide Doe with a copy of her medical records, and failed to tell her of all the medical appointments she should follow up on for the rape.    In the weeks following the assault Doe experienced cramps and bleeding.    (Doc. 319, p. 208).    She asked Carnival for her records and received a two (2) page billing

---

[7] The jury found *against* plaintiff on the claim Foster's testimony addressed.    (Doc. 307).

summary that showed services, like the STD and HIV inoculations, but Carnival did not provide her with medical records which would have put her on notice to schedule numerous appointments.   Nor did Carnival tell her of the importance of follow up care.

As the weeks progressed, Doe felt numb and lethargic.   Before the assault, she planned to join the U.S. military, but canceled the previously scheduled test as she did not feel emotionally capable.   (Doc. 319, p. 212-213). She recalled crying a lot, being irritable and emotional.   (*Id.*, p. 213).

Doe's hair soon began to fall out and it became so bad she decided to shave off her long blonde hair.   The request was so shocking that the first salon employee refused it.   After shaving all of her hair, Doe felt like it was the first time since the cruise she could breathe. She then got a tattoo on the side of her shaved head.[8]   (*Id.*, p. 213; 216; 219).

Doe's mental health greatly diminished; she contemplated suicide daily. (*Id.* at 216).   The iconic pictures (memories) of the attack stayed with her and she recounted seeing them in her mind over a thousand times since.   (*Id.*).   At her lowest point, Doe planned to commit suicide.    (*Id.* at 221-222).

---

[8] A picture of the Plaintiff with her head shaved is in the Appendix to this Brief.

## Dr. Surloff Explained Plaintiff's Condition, Behaviors, and Future Prognosis

Plaintiff's neuropsychologist, Dr. Cheri Surloff, listed specific symptoms Plaintiff exhibited that supported her diagnoses of PTSD because of the assault, such as insomnia, hypervigilance, and fear. (Doc. 319, p. 151). "She was so afraid that she would be raped or attacked, she even shaved her head." (*Id.*) "I mean she was not acting in any way in an appropriate way socially with people. She was withdrawn. She had exaggerated fears and intrusive thoughts and she had nightmares." Dr. Surloff also affirmed Doe had significant PTSD at the time of her evaluation in 2020. (*Id.,* p. 151).

Dr. Surloff also explained that Plaintiff began to act out, e.g., by shaving off her hair and enduring the pain of getting a tattoo on her head. Plaintiff wanted to make herself unattractive because she feared she might be raped again. (Doc. 319*,* p. 57).

There are different criteria for each illness or a description of each entity so that one can be sure someone meets the criteria for that illness; whether it's bipolar or depression. Dr. Surloff distinguished insomnia after a breakup from post-traumatic stress disorder. A constellation of things contribute to post-traumatic stress disorder diagnosis. Dr. Surloff explained that Doe did not meet the criteria for post-traumatic stress disorder from the childhood symptomatology. She met the PTSD criteria only after she was raped by the Carnival employee. (*Id.,* p. 149-150).

23

Dr. Surloff explained that Plaintiff has triggers that make her experience the assault all over again. She explained how everyday events (neutral stimuli), paired with the past assault, create a hyperarousal response.   For example, Plaintiff fears somebody coming up from behind her and her son when she is alone with him.   She has continuous fear when she is home alone at night or when she hears a noise in the house. (*Id*. at 59).   On nights she is alone, she cannot sleep and must have every light on. (Doc. 319, p. 224).

Regarding future treatment, Dr. Surloff recommended Doe see a psychiatrist twice a week, see a psychologist once a week for therapy, get into a group especially for post-traumatic stress disorder, and exercise for anxiety. (*Id.*, p. 64-65).   Dr. Surloff testified that because of the vulnerability that Doe had coming into this rape, that she might require much more prolonged therapy. (*Id.*, p. 66).

Carnival presented no lay or expert testimony to contradict Dr. Surloff's testimony.

## FBI Agent Andreasen's Testimony

When Agent Andreasen boarded the vessel, Carnival told her it had no video capturing Plaintiff, and she accepted that misrepresentation.   (Doc. 320, p. 30). Nor did she receive Anggara's written statement where he admitted lying to Carnival.   Andreasen testified from her notes taken while interviewing Plaintiff,

Anggara, and Amanda.   (Doc. 320, p. 28).   (*Id.*, p. 30-31).   She specifically asked

Plaintiff whether she had consented, and Plaintiff could not recall.   (*Id.*, p. 32).

Carnival was given great leeway in questioning Agent Andreasen.   Carnival

asked whether she "made it a point to observe the individual you're interviewing,

see if they are crying, fidgeting, that kind of thing," to which she responded "Yes."

(*Id.*, p. 32).   She described the Plaintiff in negative terms, as "somewhat standoffish.

She wanted to make a very brief report, but she did not want to answer many

questions.   She didn't appear to want to give any additional details.   We had to ask

a lot of very pointed questions, and she seemed kind of somewhat disgruntled to

continue to speak with us."   (*Id.,* p. 33).[9]   These and other questions prompted

Plaintiff's counsel to ask if something about Plaintiff disgusted her.   (*Id.*, p. 43).

Agent Andreasen described her interview of Mr. Anggara with no negative

commentary:

> **A.**     He told us that he was cleaning the deck.   He had the hose out.
> He watched the Plaintiff run past a few times.   He had seen her sitting
> down on one of the chairs on the deck.
>
> At some point when she ran past, he said; just walk quickly.   Don't run
> because I'm hosing the deck down and it's slippery.   And then she
> came up to him and grabbed him by the hand and asked him to hide her
> in the storage closet because she was afraid that her friend would find
> her.   He then said that she could enter the closet with him.

---

[9] At the time Plaintiff was bleeding vaginally, had not slept all night, and still had not showered.
(Doc. 319, p. 198-199; 201).

**We asked him if he closed the door all the way.   He said he closed it most of the way but left it a little bit ajar because he did not wish to be locked inside.**   She asked him if he wanted to have sexual intercourse with her.   He said no.   He said she then began to masturbate him.   At that point he said she masturbated him until he ejaculated into his hand and partially into her hand.   She then bent over in front of him, and **he asked her to place his penis inside of her.** He said he did place his penis inside of her, but he didn't know if he ejaculated further since he had already done so. . . .

\* \* \*

**Q.**   *Did you inquire of Mr. Anggara as to whether he thought the Plaintiff was too intoxicated to consent.*

\* \* \*

**A.**   *He said that he did not consider her intoxicated at all.   She did not seem intoxicated to him.*

(*Id.*, p. 33-34).   (Emphasis added).   As we have noted, Carnival's own records confirm that she was highly, visibly intoxicated.

Four aspects of Andreasen's testimony demonstrate her bias and lack of skill. First, Andreasen's acceptance of Anggara's statement that he did not consider her intoxicated *at all* despite Plaintiff's obvious and admitted intoxication (not to mention Carnival's own doctor saying she was intoxicated over two hours after the attack), falling and hitting her head, and lack of memory proves her report's untrustworthiness.   Second, the assertion that Andreasen had asked him if he closed the door all the way and his denial of having done so, is nowhere to be found in her handwritten notes of his interview (though it appears in her Report).   Her notes say

26

Anggara told her "She [Plaintiff] asked him to close the door."  (Doc. 312-26, p. 10).   Third, the statement that "he asked her to place his penis inside of her," which suggests Anggara asked for consent, is nowhere in Andreasen's notes or the Reports; she simply made it up at trial.   Fourth, she disregarded Anggara's constantly changing account.

On cross examination Andreasen conceded that she had spoken with Carnival's counsel for almost an hour before trial.   (Doc. 320, at 36).   There is "no particular reason" she did not mention on direct examination that Plaintiff told her that Plaintiff doesn't think she would have consented.   (*Id.*)   Plaintiff told Andreasen she remembers not being okay when he locked the door.   (*Id.*, p. 37).   Andreasen agreed that sexual assault victims "are generally not very forthcoming about details and giving the full story, yes."   (*Id.*).

Carnival never told her its security officers wore body cameras, which she would have investigated.   (*Id.*, p. 38).   Plaintiff asked *her* if she had been penetrated and Andreasen told her that Anggara had admitted to penetration:

> **Q**.    Okay.   You would agree under general circumstances that if a person is consenting to sexual intercourse, they actually know that it happened; correct?
>
> **A.    Yes, I would say that if they're consenting to sexual intercourse, they would be aware that it's happening.   That's part of the definition of being able to give consent.**

(*Id.*, p. 39).   (Emphasis added).   Thus, her testimony refuted her own conclusion of

consensual sex, further destroying its trustworthiness.

Andreasen conceded that Plaintiff "could not recall how she got out of the closet," but she did recall being held in the closet.   (*Id.*, p. 41):

> **Q**.    Got it.   Okay.   **Can you read that.**
>
> **A.    "She felt threatened when she saw the door locked."**
>
> **Q.**    Now, was that, like, threatened in a fun way or threatened in a scared way?
>
> **A.**    She stated also to me that she did not feel okay when she thought the door was locked, **so I would say she was stating that she felt threatened in a scared way**.

(Doc. 320, p. 41-42).[10]   (Emphasis added).

After the defense rested, the court instructed the jury on consent:

> Consent means intelligent, knowing, and voluntary consent and does not include coerced submission.   Consent does not mean the failure by an alleged victim to offer physical resistance to the offender. **Moreover, there is no consent if a person is incapable of appraising the nature of the conduct.**

(*Id.*, p. 148).   (Emphasis added).

That jury instruction follows Carnival's own RAINN (Rape, Abuse, & Incest National Network) Policies and Procedures introduced into evidence, that "consent is not the absence of a NO," and "most importantly the person must be capable of

---

[10] Note that Agent Andreasen changed the affirmative statement from her own handwritten note that "she felt threatened when she saw the door locked," to "she did not feel okay when she *thought* the door was locked."   Again, she was advocating for Carnival.

giving consent [and] is NOT under the influence, incapacitated or unconscious." (Doc. 312-46, p. 9 of 39).   A person cannot give consent when they have a diminished capacity due to being "under the influence of alcohol."   (*Id.*, p. 10 of 39).

Despite this overwhelming evidence of Mr. Anggara's sexual assault and Plaintiff's lack of capacity, Carnival cavalierly began its closing argument, "Sex between strangers, it happens all the time."   (Doc. 320, p. 108).

## The Verdict

The jury deliberated for two hours on Monday before returning fresh the next morning for a few more deliberation hours.  (*Id.*, p. 156; 159).  The jury found Carnival liable for Anggara's rape, but found *for* Carnival on Plaintiff's intentional infliction of emotional distress and negligent hiring/supervising claims.   (Doc. 307).   The jury awarded Plaintiff the compensatory damages for future psychological/medical care that Dr. Surloff recommended and $6 million for past pain and suffering and $4 million for future pain and suffering, comprising about 1/6 of what Plaintiff's counsel requested.   (Doc. 307).

## STANDARD OF REVIEW

The Plaintiff agrees with the standards of review set forth by Carnival, except that jury instructions are reviewed for abuse of discretion, not *de novo*. *Fidelity Interior Construction Inc. v. Southeastern Carpenters Regional*

*Council*, 675 F.3d 1250, 1259 (11th Cir. 2012).   This Court will reverse only if it is "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."   *Bearint ex rel. v. Dorell Juvenile Group Inc.*, 389 F.3d 1339, 1351 (11th Cir. 2004).

## SUMMARY OF THE ARGUMENT

Carnival crewmember Fredy Anggara sexually assaulted Plaintiff who was blackout drunk and concussed from hitting her head moments before the assault. Common carriers like Carnival are strictly liable for crew members' sexual assaults. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891 (11th Cir. 2004).

Carnival advances a cadre of unpreserved, invited, and/or harmless error. None of these issues affected Carnival's substantial rights.   *Proctor v. Fluor Enters.,* 494 F.3d 1337, 1352 (11th Cir. 2007).   The summary judgment on Doe's false imprisonment claim should be affirmed because Carnival's response presented no admissible evidence because the FBI's Reports' conclusions were untrustworthy and unfairly prejudicial.   Carnival's Rule 705 argument must be rejected because Plaintiff's experts did not rely upon the FBI Reports' conclusions.

The district court properly denied Carnival's eleventh hour motion for reconsideration because Carnival stipulated to the introduction of the handwritten FBI notes yet waited until the end of trial to raise the issue.   "This type of gamesmanship" will not be rewarded where a party chooses to remain silent to gain

an advantage, and then pipes up when the tactical decision blows up in its face. *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 741 F.3d 1349, 1357 (11th Cir. 2014). Like Rule 60(b)(6), Rule 54(b) "does not reward a party that seeks to avoid the consequence of its own 'free, calculated, deliberate choices.'" *Id.* (quoting *Ackermann v. United States*, 340 U.S. 193, 198 (1950).

Maritime law does not recognize a mitigation of non-economic damages defense; nor did Carnival present an appropriate jury instruction to support its claim.

The district court properly awarded prejudgment interest because the jury's verdict delineated past from future damages. *Reichert v. Chemicals Carriers, Inc.*, 794 F.2d 1557 (11th Cir. 1986).

The district court properly denied Carnival's Motion for Remittitur. Non-economic harms are reviewed under a particularly deferential standard because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses. *Ferrill v. Parker Group Inc.*, 168 F.3d 468 (11th Cir. 1999). Carnival failed to address damages during closing argument, despite using only 33 of its 75 allotted minutes. (Doc. 320, p. 108-129; 2:32 p.m. to 3:05 p.m.).

**ARGUMENT**

I. **THE TRIAL COURT PROPERLY GRANTED PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FALSE IMPRISONMENT AND DID NOT ABUSE ITS DISCRETION BY DENYING CARNIVAL'S INITIAL MOTION FOR RECONSIDERATION BECAUSE ANGGARA'S STATEMENTS ARE HEARSAY, AND THE FBI REPORTS' CONCLUSIONS WERE UNTRUSTWORTHY, AND UNFAIRLY PREJUDICIAL UNDER RULE 403**

A. **The FBI Reports' Conclusions Are Untrustworthy and Unfairly Prejudicial**

This Court may affirm the partial summary judgment order and denial of reconsideration for any reason supported by the record, even if not relied on or considered by the district court. *Aaron Private Clinic Mgmt., LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012). Thus, regardless whether the original grant of summary judgment was based upon a ruling that the FBI Reports' conclusions (whether deemed legal or factual) and declination of criminal prosecution were untrustworthy or inadmissible under Rule 403, this court may affirm on those bases.

In its response, Carnival failed to raise and therefore waived the argument that the FBI agent's "conclusion" that the sexual encounter was consensual could be admitted under the public records exception to the hearsay rule. Carnival asserts that it was Plaintiff's responsibility to demonstrate the FBI report was untrustworthy, but

that is putting the cart before the horse. Carnival first had to *assert* that the FBI report fit a hearsay exception, which it did not.

Regardless, Andreasen's "conclusions" were untrustworthy. Courts evaluate trustworthiness under four non-exhaustive factors: the timeliness of the investigation, the investigator's skill/experience, whether a hearing was held, and possible bias. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). Here, all four support untrustworthiness. Although the investigation was timely, that actually resulted in an *incomplete* investigation because the FBI was unaware of the BWC and the CCTV video, and Anggara's written statement. No hearing was held. And, agent Andreasen's lack of skill and bias suggest untrustworthiness.

Andreasen ignored the overwhelming evidence that Plaintiff was blackout drunk and could not remember much of the encounter. Those are classic definitions of lack of capacity to consent, as confirmed by the jury instructions, Carnival's own policies, and Agent Andreasen's trial testimony. (Doc. 312-46; Doc. 320, p. 29; Doc. 320, p. 145). Andreasen never asked how many drinks Plaintiff consumed, or she would have realized that Mr. Anggara's "statement" that he did not think Plaintiff was intoxicated "at all" was untrustworthy.

She took Carnival's word that no CCTV video captured Plaintiff's or Anggara's movements, and did not know that Carnival had BWC video of their statements. Her investigation was perfunctory, and her conclusions untrustworthy.

33

Even were the FBI Reports trustworthy, "safeguard[s] built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167-168 (1988). The district court ruled that the FBI Reports' conclusion of consensual sex and no prosecution were irrelevant and unfairly prejudicial. (Doc. 315, p. 9; Doc. 320, p. 67-69).

The Supreme Court expressed "no opinion on whether legal conclusions contained in an official report are admissible as 'findings of fact' under Rule 803(8)(C)." *Id.* Both Andreasen's subjective conclusion that the act was consensual and the decision not to file criminal charges are *legal* conclusions.

Carnival's assertion that federal agency reports are often "highly probative" applies to bench trials. *Barfield v. Orange County*, 911 F.2d 644, 649 (11th Cir. 1990). In jury trials "there may be circumstances in which that probative value, although properly considered by a trial judge in a bench trial, nonetheless is outweighed by the danger of creating unfair prejudice in the minds of a jury." *Id.* at 650. *Barfield* concluded that "[b]ecause the decision whether to admit such reports involves so many variables, we think it best to leave the decision in the sound discretion of the district court." *Id.*

Jury trials require application of Rule 403:

However, the change from a bench to a jury trial may very well affect the analysis under Rule 403. The admission of an EEOC report, in certain circumstances, may be much more likely to present the danger of creating unfair prejudice in the minds of the jury than in the mind of the **trial judge, who is well aware of the limits and vagaries of administrative determinations and better able to assign the report appropriate weight and not more**. . . .

*Id.* at 651. (Emphasis added).

In *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331 (11th Cir. 2020) the reports merely established the *fact* that an unguarded meat slicing machine causes injuries. Even *United States ex rel. Barrick v. Parker-Migliorini Int'l,* 79 F.4th 1262 (10th Cir. 2023) noted that FBI 302 reports are admissible "unless they are shown to be untrustworthy *or inadmissible for other reasons*." *Id.* at 1274 (emphasis added).

The district court properly exercised its 403 discretion to exclude the FBI Reports. Given the high burden of proof in a criminal prosecution, a decision not to criminally prosecute has little – if any – probative value to a civil jury's, preponderance-of-the evidence consent determination. *Hines v. Brandon Steel Decks*, 886 F.2d 299, 303 (11th Cir. 1989) (noting that the court may consider whether the preparer was using a higher standard than the law requires). Because of the great danger that the imprimatur of the Government's declination of prosecution could have upon a civil jury, even with a limiting instruction, the district court did not abuse its 403 discretion.

*Miller v. Field*, 35 F.3d 1088 (6th Cir. 1994) held that statements by the prosecutor regarding reasons for not pursuing criminal charges were inadmissible. *Id.* at 1092. *Miller* distinguished between opinions "based on evidence *actually observed by the preparer*," and those "when the preparer relies on potentially untrustworthy hearsay evidence from another individual under no duty to provide unbiased information." *Id.* at 1091-1092. Here, the conclusions were not based upon evidence actually observed by Agent Andreasen but rather on Anggara's clearly untrustworthy hearsay. Likewise, *United Technologies Corp. v. Mazer*, 556 F.3d 1260 (11th Cir. 2009) which relied upon *Miller*, held that only a police report's conclusions that result from "the officer's own observations and knowledge" may be admitted, not those based upon statements made by third persons. *Id.* at 1278. The district court followed this holding in its summary judgment order. (Doc. 151, p. 8). In *Goodman v. Kimbrough*, 718 F.3d 1325, 1333, n. 2 (11th Cir. 2013) this Court directly addressed only double hearsay in a report to distinguish it from conclusions which had not been challenged and were not at issue in the case.

### B.   Plaintiff's Uncontroverted Direct Testimony and Carnival's Own Records Established Her Claim

The Report and Recommendation acknowledged that "the parties agree that Doe does not remember how she entered or left the storage closet." (Doc. 151, p. 5). However, Doe's evidence that she was held against her will when she was in the storage closet was supported by "Doe's sworn deposition in which she has

firsthand knowledge of the incident," which evidence "alone supports her false imprisonment claim."   (Doc. 151, p. 6).

Her handwritten statement, a Carnival business record, states "I remember him locking the door."   (Doc. 93-5, p. 1).   "He stood by the lock."   (*Id.*, p. 2). Still in shock moments after the assault, she told Amanda that he "pulled her in there and said that she needed to bend over – or in order to let her out, she needed to bend over . . . ."   (Doc. 93-6, p. 2 of 4).   That statement to Amanda immediately after returning to her cabin was "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," and therefore an excited utterance.   Fed.R.Evid. 803(2).

This Court uses a totality of circumstances test to determine whether a statement was an excited utterance.   *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1316 (11th Cir. 2022).   Here, the totality of circumstances, the first opportunity a few minutes after a rape, while still highly intoxicated, makes Plaintiff's statement to Amanda an excited utterance.   That statement was made long before Plaintiff arrived in the medical clinic, where Carnival's doctor noted she was still "in emotional distress, under the effect of alcohol."   (Doc. 312-2, p. 7). *U.S. v. Smith*, 606 F.3d 1270, 1279-1280 (10th Cir. 2010) ("At the first possible moment to disclose the assault to another person, she made the challenged statement.").   *See, e.g., Robinson v. United States*, 2022 WL 19001971 at *15 (N.D.

Ga. 2022); *Packer v. Jones*, 2010 WL 7367820 at *11 (S.D. Ala. 2010) (statements made by rape victims within several hours of the rape qualify as excited utterances).

Carnival had no evidence to rebut that testimony. Thus, the Magistrate Judge properly concluded that "there is no evidence that the jury could rely on to reject Doe's undisputed recollection that at some point inside the closet Mr. Anggara did not let her exit the closet after she sought to do so." (Doc. 151, p. 10). The FBI Reports' conclusions do not address that issue, so they cannot create a genuine issue of material fact.

The observations made in *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir. 1986) were directed to a claim that deposition testimony conflicted with an earlier affidavit. Here, the Plaintiff's memory was spotty, not due to a bad memory or lapse of time, but rather to her blackout drunk condition – the same condition that made it impossible for her to consent to sexual activity. The Magistrate Judge had (1) her direct testimony she was afraid when Anggara locked the door; (2) her handwritten statement, "I remember him locking the door," given that morning (Doc. 93-5, p. 1); and (3) her excited utterance to Amanda that he "pulled her in there . . . and said in order to let her out, she needed to bend over. . . ." (Doc. 93-6, p. 2 of 4). Carnival had only Mr. Anggara's inadmissible double hearsay.

**II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED CARNIVAL'S "RENEWED" MOTION TO RECONSIDER BECAUSE CARNIVAL STIPULATED TO THE ADMISSION OF THE EVIDENCE, AND MOVED IT INTO EVIDENCE ON THE FIRST DAY OF TRIAL, YET WAITED UNTIL NEAR THE CONCLUSION OF TRIAL TO SEEK RECONSIDERATION**

For its *own* tactical reasons Carnival – not Plaintiff – created the scenario that unfolded.   Carnival desperately wanted to put Anggara's hearsay statements before the jury because Carnival could not – or chose not to – secure his testimony for trial. To be sure, the Plaintiff saw value in Mr. Anggara's hearsay statement that he penetrated the Plaintiff during the encounter in the closet.   But Carnival *needed* to present Anggara's "testimony."   So Carnival entered into a Faustian hearsay stipulation.

Carnival has only itself to blame for the predicament it faced when it *finally* asked the trial court to reconsider the summary judgment ruling after a week of trial, on the Sunday afternoon before Monday's closing arguments.[11]   The jury had heard testimony from six live witnesses and five deposed witnesses, many of whom had left the jurisdiction.   Carnival failed to raise those stipulated FBI notes either in its objections to the R&R (Doc. 153) or as a basis for its pretrial Motion for

---

[11] Carnival's delay is inexcusable given that Carnival had orally flagged the issue "under the rule of completeness" during a pretrial hearing a month before trial.   (Doc. 315, Tab B, p. 10-12). Clearly, Carnival did not raise the issue in a written *pretrial* motion for fear it would undo *Carnival's* stipulation, without which it would have no evidence to support Anggara's version of events.

Reconsideration.  (Doc. 214).   Had Carnival made that argument pretrial, the trial court could have considered the stipulated evidence and, if necessary, forced Plaintiff to decide between keeping the summary judgment order, or withdrawing its stipulation to have the notes entered into evidence.   But Carnival failed to do so, and therefore failed to preserve this issue for appeal.   *See, e.g., Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004).

On the morning after the belated Motion, Plaintiff's counsel explained that he never would have stipulated to the introduction of the FBI notes if Carnival had argued that would affect the partial summary judgment.  (Doc. 320, p. 15).   Nor would he have admitted Fredy Anggara's statement.  (*Id.*)  Carnival's about-face was a due process violation that prejudiced Plaintiff.  (*Id.*, p. 14-15).

Typically, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted.   *Ruiz v. Wing*, 991 F.3d 1130, 1140 (11th Cir. 2021).   Nor can Carnival establish that the alleged error affected its substantial rights.   *Proctor v. Fluor Enters.*, 494 F.3d 1337, 1352 (11th Cir. 2007).   Carnival concedes, had the conclusions been admitted, the court would have been forced to provide a limiting instruction to distinguish between the criminal and civil standards. The district court reasonably declined to conduct such a "mini trial" before the jury. (Doc. 315, Tab B, p. 9).

Indeed, Carnival introduced a Carnival retraction of allegation form Plaintiff

had signed, but not filled out herself.   The jury obviously rejected that statement, written not by the Plaintiff but by a Carnival employee, as having been signed as a blank form while Plaintiff was still intoxicated.   (Doc. 319, p. 194).   If the jury did not find for Carnival based upon a signed retraction of allegation, it likely would not have been swayed by Agent Andreasen's untrustworthy conclusions.

Regardless, the jury could easily discern Andreasen's conclusion from her testimony.   Andreasen was a clear advocate for Carnival.   Carnival's counsel vouched for her conclusions in closing argument when he told the jury "and you watched [Adreasen] today with your own eyes, and **you could see that she believed** [Anggara] told the truth.   And you could also see that she didn't particularly believe that the Plaintiff did."   (Doc. 320, p. 123).

When it addressed Carnival's eleventh hour Renewed Motion, the district court reminded the parties "just so we are clear, **again**, I have reviewed the Reports, have reviewed the cited case law, and **I have done a 403 balancing test** with regard to the content."   (Doc. 320, p. 67).   (Emphasis added).   The district court also noted "the agents were onboard for, it appears, three hours, they interviewed persons, and they did not have the benefit of three years of discovery. . . ."   (Doc. 320, p. 67).

The district court explained that Andreasen did not know all of the facts when she wrote her report.   Unlike the SEC Report in *United States v. Gluk,* 831 F.3d

608, 615 (5th Cir. 2016) Andreasen was *not* "better positioned to make factual findings" precisely because the FBI's investigation happened so quickly.   Due to Carnival's lies and omissions, the FBI was unaware of any CCTV video depicting the Plaintiff; the BWC statements of the Plaintiff and Anggara, and Anggara's written statement where he admitted lying.   (Doc. 312-39) (**"I'm sorry I lied to security, but when I was with the female guest in the locker when she bend down I put my dick inside the pussy."**)   (Emphasis added).

The district court continued:

> And for the agent to report out to this jury conclusions based on the three hours they were on the ship **would be more prejudicial than probative, and so I have consistently excluded it;** albeit the parties agreed that the agent's rough notes would come into evidence . . . .

(Doc. 320, p. 67-68).   (Emphasis added).   The district court softened the false imprisonment jury instruction, without objection.   (Doc. 320, p. 70-71).

Before announcing her ruling the district court referenced the prior Motion for Reconsideration. "Interestingly, Carnival never cited the draft notes that were ultimately introduced into evidence; they cited only the FBI 302s and two sentences on page 3 of docket entry 214." (*Id.*, p. 69).   The court ruled:

> Carnival did not argue that now that they had agreed to introducing these documents the landscape had altered requiring me to revisit summary judgment. . . .
>
> But, nevertheless, the argument that is now being advanced that the admission of the notes changes what the Court has to rely on was not set forth in Carnival's motion.   And as you will recall, I denied that

motion.   **It is now being raised for the first time at the end of trial**.

Mr. Courtney's argument is that he has been prejudiced because he has not designed this case around this issue, thinking it had been resolved. . . .

* * *

So I am going to in my discretion find that this, indeed, would be prejudicial to the Plaintiff at this time, and I am not going to revisit the Order that Judge Torres entered.

(*Id.*, p. 69-70).   (Emphasis added).

That ruling presciently follows *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367 (11th Cir. 2024).   Rule 54(b) governs a court's reconsideration of interlocutory orders, and provides that such orders "**may**" – not shall – "be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."   Fed.R.Civ.P. 54(b). (Emphasis added).

Such orders are "review[ed] only for abuse of discretion."   *Id.* at 1379. Here, as in *Hornady*, there was no abuse of discretion:

Though district courts enjoy plenary *power* to reconsider non-final rulings, they need not employ plenary *review* when doing so.   Indeed, in most instances district courts should hesitate before revisiting their earlier interlocutory orders; important interests of finality, stability, and predictability underly that justifiable caution. . . .

*Id.* at 1380 (emphasis in original).

Because Carnival delayed so long, *Hornady's* tardiness observation applies:

. . . And finally, the more time that has passed between a district court's ruling and a party's motion to reconsider that ruling, the less willing the court ought to be to entertain the party's request.   Parties must 'be able

to rely on the rulings that progressively direct proceedings toward trial.' 18 B.Wright & Miller, *supra*, Section 478.1.

In short, district courts have discretion to revisit their prior interlocutory orders, considering both the weight of the moving party's arguments and *the disruption that a change would cause in light of the time that has passed since the decision was initially made.* Only when the district court abuses that considerable discretion will we set aside a Rule 54(b) decision.

*Hornady*, 118 F.4th at 1381. (Emphasis added). *Cf. Tessmer v. Walker*, 833 F.2d 925, 926 (11th Cir. 1987) (dealing, not with a summary judgment motion, but a Rule 60(b) Motion to Reinstate a late filed appeal, where, unlike Carnival, Tessmer was diligent).

*In re Louisiana Crawfish Producers,* 852 F.3d 456 (5th Cir. 2017) is easily distinguished because there, despite due diligence by plaintiff's counsel, the evidence was not available until five days after the district court's ruling. *Id.* at 462. *Good Luck Nursing Home Inc. v. Harris*, 636 F.2d 572 (D.D.C. 1980) is inapplicable because that complete summary judgment ended all judicial labor, and the aggrieved party timely filed a motion under Rule 60(b). Here, Carnival stipulated to the introduction of those facts on the same day it filed its objections to the R&R and again when it moved for Reconsideration, without arguing that the stipulated facts required reversal of the summary judgment. This was clear waiver. *Access Now, Inc. v. Sw. Airlines Co.*, *supra.*

44

### III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY REFUSING TO PERMIT CARNIVAL TO USE FED.R.EVID. 705 TO ADMIT UNFAIRLY PREJUDICIAL OPINIONS PLAINTIFF'S EXPERTS NEVER SAW LET ALONE RELIED UPON

Carnival's argument that the FBI conclusions should have been permitted via a contrived "impeachment" of Plaintiff's experts must be rejected. Carnival never established that Plaintiff's experts Foster and Surloff were provided with the two FBI *Reports*. The handwritten FBI notes, Joint Exhibit 26, contain no conclusions. (Doc. 312-26). Mr. Foster's expert report merely identified "FBI records" as one of the 32 items he had reviewed.

Carnival's assertion that Dr. Surloff relied on the FBI Reports citing Doc. 319, p. 86-87 is wrong. Dr. Surloff merely referenced "records that were sent to me." (Doc. 319, p. 86). "I can't tell you the exact document because I don't have it in front of me, but it was one of the documents that was *from the cruise ship.*" (*Id.*, p. 89, emphasis added). Carnival handed the FBI Reports to Dr. Surloff's to refresh her recollection (I.B., p. 42, n. 4) but she denied ever seeing them, so the district court correctly ruled that the Reports could not impeach her under Rule 705. (Doc. 319, p. 90-91).

Carnival's feigned surprise that Dr. Surloff had relied upon the handwritten *notes* (I.B., p. 42) is hard to swallow. Carnival did not depose Dr. Surloff and never raised any Rule 26 concerns. Regardless, Carnival declined the district court's offer

to recall Dr. Surloff.   (Doc. 319, p. 115).

This Court has long held that it is improper to use otherwise inadmissible evidence for impeachment when the purpose of its use is not legitimately to impeach the witness but to put inadmissible evidence before the jury.   *See Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541 (5ᵗʰ Cir. 1978).[12]   *See also, Bobb v. Modern Products, Inc.*, 648 F.2d 1051 (5ᵗʰ Cir. June 26, 1981) (reversing because "plaintiff's witness did not state that he had relied on the report, even though he had admitted that he had seen it.")

*Bryan* makes a crucial distinction between an expert reading or relying upon data or evidence within a report, and relying upon, or rejecting a contrary opinion of the report's author.   Even the act of reading them is insufficient to permit Rule 705 impeachment:

> . . . In this case, Walters did not admit that he relied on the conclusions reached by Lambert and Wisemen nor was Walters testifying solely from the Lambert and Wiseman reports.   Rather, Walters admitted that he used statistical evidence on yield strength and other empirical data contained in the reports and employed these figures to reach his own conclusions.   The statistics from the reports and Walters' reliance upon them were properly brought out under Rule 705.   The conclusions reached by the other experts did not impeach Walters' use of the statistics.

*Bryan*, 566 F.2d at 546.   *Accord, Jensen v. EXC, Inc.*, 82 F.4ᵗʰ 835 (9ᵗʰ Cir. 2023)

---

[12] Decisions of the Fifth Circuit Court of Appeal issued prior to September 30, 1981 are binding precedent in this circuit.   *See, Bonner v. City of Prichard, Ala.*, 661 F. 2d 1206 (11ᵗʰ Cir. 1981).

(relying upon *Bryan*).  Here, the two unfairly prejudicial conclusions in the FBI Reports could not possibly impeach Foster or Dr. Surloff's reliance on the handwritten notes.

*Barrera v. E.I. Du Pont de Nemours & Co.,* 653 F.2d 915, 921 (5th Cir. 1981) involved neither Rule 703 nor 705.  Nor is *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991) helpful.  Although Rule 703 "creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion," the district court properly kept Carnival's Rule 705 sword sheathed as to the FBI Reports' conclusions.

## IV.    CARNIVAL FAILED TO: (A) ESTABLISH THAT MARITIME LAW ACKNOWLEDGES A MITIGATION OF NON-ECONOMIC DAMAGES DEFENSE; (B) CARRY ITS BURDEN TO PROVE MITIGATION OF DAMAGES; AND (C) PRESENT AN INSTRUCTION ON MITIGATION OF PSYCHOLOGICAL CARE DAMAGES

The rejection of a proposed jury instruction is reviewed for an abuse of discretion and will be reversed only if it was (1) substantially correct, (2) not addressed in the charges actually given, and (3) failure to give the instruction impaired the requesting party's ability to present an effective case.  *Fidelity Interior Const. Inc. v. Southeastern Carpenters Regional Council*, 675 F.3d 1250, 1259 (11th Cir. 2012).  To reverse, this Court must be "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."

*Bearint ex rel. v. Dorell Juvenile Group Inc.*, 389 F.3d 1339, 1351 (11th Cir. 2004) (quoting *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997)).

Citing *Frederick v. Kirby Tankships, Inc.,* 205 F.3d 1277 (11th Cir. 2000), Carnival asserts that admiralty courts have recognized a mitigation affirmative defense since 1966.   But *Kirby* and the cases cited therein address only mitigation of economic damages.   *Fashauer v. New Jersey Transit R. Operations, Inc.*, 57 F.3d 1269, 1289 (3d Cir. 1995) (failure to mitigate lost wages).   *See also, Sayer v. Musicland Group, Inc.*, 850 F.2d 350 (8th Cir. 1988) (earnings mitigation); *NLRB v. Pilot Freight Carriers Inc.*, 604 F.2d 375 (5th Cir. 1979) (same); *Conjugal Partnership v. Conjugal Partnership*, 22 F.3d 391 (1st Cir. 1994) (same).   *See also, Boudreau v. S/V Shere Khan C,* 27 F.Supp.2d 72, 81 (D. Me. 1998) (addressing lost earning capacity).   Likewise S*tate ex rel. Dresskell v. City of Miami*, 13 So.2d 707 (Fla. 1943) also involved economic damages.   *Accord, Dolsak v. Comm'r of Soc. Sec.*, 724 F.App'x 914 (11th Cir. 2018) (referring to work limitations).

That is why this Circuit's Pattern Jury Instruction 8.1 for Jones Act claims (a maritime tort action) refers only to a failure to "seek out or take advantage of a business or employment opportunity."   (Doc. 241, p. 24).   Carnival sought to excise "business or employment," leaving only "opportunity," which would have been confusing.   (Doc. 315, Tab E; p. 36).   Carnival promised to find authority to support its argument, but never did, and still hasn't.

At trial Carnival cited *Rubenstein v. Yehuda*, 38 F.4th 982 (11th Cir. 2022), a non-maritime case involving economic damages.    The only maritime case Carnival argued involved an instruction that addressed employment, not psychological damages.   (Doc. 320, p. 18-19).

Carnival's reliance upon *Nevor v. Moneypenney Holdings, LLC*, 842 F.3d 113, 119 (1st Cir. 2016) for the proposition that "admiralty courts have thus permitted mitigation defenses even where a plaintiff seeks 'non-economic damages' for 'pain and suffering, mental anguish, and the like,'" lacks candor.   *Nevor* only addressed mitigation of lost earning capacity damages, not pain and suffering damages. Carnival has not cited any admiralty authority addressing mitigation of non-economic damages.

That leaves Carnival with *Ornstein v. New York Health & Hospitals Corp.*, 881 N.E.2d 1187 (N.Y. 2008) and *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979).   *Ornstein* differs because the statement upon which Carnival relies is *obiter dictum*.   The court was speaking hypothetically when it noted that "a defendant who believes that a plaintiff has unreasonably failed to take steps to relieve emotional distress arising from an exposure incident can raise a failure to mitigate damages defense."   *Id.* at 1193.   The court cited no authority nor was mitigation of damages an issue on appeal.   Although *Chuy* references a

mitigation of damages instruction, there was no argument on appeal that the instruction was improper.

Mitigation of damages is an affirmative defense for which Carnival bore the burden of proof. *Frederick v. Kirby Tankships, Inc.*, *supra.* *See also, Garcia v. Walmart Stores, Inc.*, 2009 F.3d 1170, 1174 (10th Cir. 2000) (finding no error in failing to give mitigation of damages instruction regarding plaintiff's failure to obtain psychological counseling where defendant did not prove that there had been a failure to mitigate). Carnival withdrew Dr. Calbeck, the only expert witness who could address the Plaintiff's alleged failure to seek earlier counseling due to Carnival's egregious Rule 26 violations, for which it was sanctioned mid-trial. (Docs. 318, p. 90-91; 319, p. 4).

Regardless, Carnival refused to provide the Plaintiff with her own medical records, including a note from the ship's doctor to "[p]erform HIV antibody testing during the original assessment and again at 6 weeks, 3 months, and 6 months after the assault" and to **"[f]ollow up with mental health services for counseling**." (Doc. 412; Exhibit 2-7, p. 8 of 17) (emphasis added). (Doc. 319, p. 210). She was unaware that the ship's physician had recommended any follow-up medical or psychological care. (Doc. 319, p. 211). Carnival conceded that "they should have given her her medical records . . . ." (Doc. 320, p. 119).

During cross examination, Plaintiff asked if she could explain why she had not seen a therapist earlier, but Carnival's counsel cut her off. (Doc. 319, p. 249-250). Plaintiff's medical records confirm that "she has been trying to find a therapist and has called at least 20 and haven't [sic] gotten a call back. Last summer, she went to a crisis center." (Doc. 412-8, p. 2).

Throughout 2020 Plaintiff treated with a therapist through Zoom appointments. (Doc. 319, p. 224-225). She spent $3,000 - $4,000 on therapy. (*Id.* at 226). One of the purposes of this lawsuit was to recover compensation to seek such therapy.

Accordingly, Carnival was not entitled to a mitigation of damages instruction for failure to seek psychological care. Carnival provided no testimony that any earlier or better treatment would have mitigated Plaintiff's damages nor did Carnival even address damages in its closing argument. Thus, Carnival has failed to establish error, let alone prejudicial error.

## V.    THE DISTRICT COURT PROPERLY CALCULATED AND AWARDED PREJUDGMENT INTEREST

Prejudgment interest is awarded in maritime cases except in unusual circumstances. *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 196 (1995) (neither a good-faith liability dispute nor the existence of mutual fault justifies denial of pre-judgment interest in an admiralty case). The general rule of this circuit is to award prejudgment interest in admiralty cases. *Sunderland Marine*

*Mut. Ins. Co. v. Weeks Marine Const. Co.*, 338 F.3d 1276, 1280 (11th Cir. 2003). So Plaintiff pleaded entitlement to prejudgment interest.   (Doc. 1, p. 25; 27).   Had the jury been tasked with awarding prejudgment interest, it would have been instructed in accordance with the above authority, and the same result would have obtained.

In *Reichert v. Chemical Carriers Inc.*, 794 F.2d 1557 (11th Cir. 1986) this Court held that for the prejudgment interest award to be proper there need only "be some way *for the Court* to determine the correct amount to award."   *Id.* at 1559. (Emphasis added).   In *Reichert*, the jury's damage award did not distinguish past from future damages.   This Court held that the award of prejudgment interest was improper – not because the district court had made the award – but because it "had no way to determine upon what portion of the judgment, if any, to award prejudgment interest."   *Id.*   In *Lebron v. Royal Caribbean Cruises Ltd.*, 2021 WL 2917265 at *2 (11th Cir. 2021), this Court reaffirmed *Reichert* and concluded that "it is within a district court's discretion to award prejudgment interest for pain and suffering, and to undertake a calculation to determine what portion of an award is for past pain and suffering."

Carnival mistakenly relies on *E.S.I. Meats Inc. v. Gulf Fla. Terminal Co.*, 639 F.2d 1348, 1357 (5th Cir. 1981), "an appeal from judgments in five non-jury diversity cases," not a maritime case. The parties agreed that Florida law governed

prejudgment interest.  *Id.* at 1357.   Under Florida law there is no right to prejudgment interest for non-economic damages in personal injury cases.  *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, n. 1 (Fla. 1985).   Likewise, *Gilliam v. Allen*, 62 F.4th 829 (4th Cir. 2023) was a §1983 case.

In *Havis v. Petroleum Helicopters Inc.*, 664 F.2d 54, 55 (5th Cir. December 14, 1981) the sole issue was whether the district court erred in awarding prejudgment interest *at* 10% versus 7%.  *Id.* at 55.   In *dicta* the Fifth Circuit agreed with *Robinson v. Pocahontas Inc.*, 477 F.2d 1048 (1st Cir. 1973), but merely reversed on the rate of interest and remanded to amend the rate to 7%.  *Id.* at 55-56.

If this Court had wanted to follow *Havis* or *Pocahontas*, it would have held in *Reichert* or *Lebron* that the calculation of prejudgment interest must be made by the jury.  Instead, it merely held that "the district court did not abuse **its** discretion in refusing to make a guess as to the appropriate amount of prejudgment interest."  *Id.* (Emphasis added). Thus, this Court acknowledged that the district court has the discretion to award prejudgment interest.

## VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING CARNIVAL'S MOTION FOR REMITTITUR, WHERE THERE WAS UNCONTROVERTED EVIDENCE OF PLAINTIFF'S DAMAGES,  AND CARNIVAL FAILED TO ADDRESS DAMAGES IN CLOSING ARGUMENT

Damage awards for intangible, non-economic harms are reviewed under a particularly deferential standard "because the harm is subjective and evaluating it

depends considerably on the demeanor of the witnesses." *Ferrill v. Parker Grp. Inc.*, 168 F.3d 468, 476 (11th Cir. 1999); *See also. Griffin v. City of Opa-Locka,* 261 F.3d 1295 (11th Cir. 2001) (affirming denial of remittitur of $2 million verdict for sexual assault and rape a quarter century ago).

Large jury verdicts, in and of themselves, are not grounds for remittitur. Carnival speculates as to the jury's motivation for the verdict but offers no evidence of "passion or prejudice" by the jury, because there is none.   The jury awarded Plaintiff 1/6 of the non-economic damages she requested.   (Doc. 307).

"It is difficult for a party to challenge an award as excessive after the fact when that party declined to offer any guidance to the jury at trial."   *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1207 (11th Cir. 2020) (quoting *Odom v. R.J. Reynolds Tobacco Company*, 254 So.3d 268, 280 (Fla. 2018)).   Carnival suggests that the $10 million jury award for past and future pain and suffering and intangible damages should be remitted to the present value of the $1 million awarded by a jury in *Doe v. Celebrity Cruises Inc.*, 394 F.3d 891 (11th Cir. 2004), where the verdict was rendered over 22 years ago. *See Doe v. Celebrity Cruises Inc.*, 287 F.Supp.2d 1321, 1325 (S.D. Fla. 2003).   "Juries are not required to exercise their judgment consistent with other juries in other cases."   *Kerrivan,* at 1207.

Carnival argues that Plaintiff's request for $60 million in damages was an "anchor" untethered to reality.   But the number was not grabbed out of thin air.   It

was in line with a recent Broward County maritime rape case, *Baca v. Island Grove, Ltd.* (Doc. 343-2; 343-3; 343-4).    Like Plaintiff, Samantha Baca was in her early twenties when she was sexually assaulted on a ship.   In 2018, the same year of Plaintiff's sexual assault, a Florida jury awarded Ms. Baca over $70 million, including $66 million for pain and suffering.   ($6 million for past pain and suffering and $60 million for future pain and suffering). (Doc. 343-2).   The trial court denied remittitur, and the case settled on appeal.   (Docs. 343-3; 343-4).

In *John Doe No. 69 v. Father Neil Jo. Doherty*, Case No. 11-10986 CA 05, a Florida jury awarded the exact amount for past pain and suffering $6 million for future pain, $4 million, as our case. (Doc. 343-1).   These verdicts reflect the serious lifetime harm caused by sexual assaults.   *See also, Doe v. School Board of Miami-Dade County Florida*, 2022 WL 3973881 (S.D. Fla. 2022) (awarding a sexual assault victim $3 million for past and $3 million for future pain and suffering).

## <u>CONCLUSION</u>

Not only did Carnival get a fair trial, it got precisely the trial it engineered. This Court should affirm the Final Judgment in every respect.

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).   This brief contains 12,989 words.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 6, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

**PHILIP D. PARRISH, P.A.**
*Counsel for Appellee*
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Tel: 305-670-5550/Fax: 305-670-5552
Email: phil@parrishappeals.com
        betty@parrishappeals.com

By:  */s/ Philip D. Parrish*
        Philip D. Parrish, Esquire
        Florida Bar No. 0541877

## SERVICE LIST

Daniel W. Courtney, Esq.
Daniel W. Courtney, P.A.
***Counsel for Plaintiff***
10800 Biscayne Blvd., Suite 700
Miami, FL   33161
Tel. 305-579-0008
dc@danielcourtneylaw.com

Curtis J. Mase, Esq.
Lauren N. Cabeza, Esq.
Tyler J. Rauh, Esq.
William R. Seitz, Esq.
Charlotte A. Robinson, Esq.
Lauren A. Levitt, Esq.
Mase Seitz Briggs, P.A.
***Counsel for Defendant***
SBS Tower
2601 S. Bayshore Drive
Suite 800
Miami, FL   33133
Tel. 305-377-3770
Fax 305-377-0080
cmase@maselaw.com
lcabeza@maselaw.com
trauh@maselaw.com
wseitz@maselaw.com
crobinson@maselaw.com
llevitt@maselaw.com

Lauren A. Levitt, Esq.
Mase Seitz, P.A.
***Counsel for Defendant***
11870 SW 94 Street
Miami, FL   33186
Tel. 305-409-9805
LLevitt@maselaw.com

Catherine E. Stetson, Esq. (Pro Hac Vice)
Hogan Lovells
555 13th Street NW
Washington, DC 20004
Tel. 202-637-5491
*Co-Counsel for Defendant, Carnival*
Cate.stetson@hoganlovells.com

# APPENDIX

**U.S. District Court**
**Southern District of Florida**

**PLAINTIFF'S EXHIBIT:<u>13</u>**

**Plaintiff's Video Recorded Statement Screenshots**

**CASE NUMBER:  19-cv-24766-WILLIAMS**

**JANE DOE,**

        **Plaintiffs,**

**vs.**

**CARNIVAL CORPORATION,**

        **Defendant.**



USCA11 Case: 24-13159   Document 28   Date Filed: 03/06/2025   Page: 74 of 76

**Plaintiff 13-2**

**U.S. District Court**
**Southern District of Florida**

**JOINT EXHIBIT:** <u>45</u>

**Photo of Jane Doe with shaved head and head tattoo**

**CASE NUMBER:  19-cv-24766-WILLIAMS**

_____

**JANE DOE,**

       **Plaintiffs,**

**vs.**

**CARNIVAL CORPORATION,**

       **Defendant.**

_____



**JE 45-1**